# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| DIANNA HEAVILIN, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 2:10-CV-505-JVB |
| ) | |
| MADISON NATIONAL LIFE INSURANCE CO. ) | |
| and DISABILITY REINSURANCE ) | |
| MANAGEMENT SERVICES, INC., ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Plaintiff Dianna Heavilin was a guidance counselor in Indiana's South Central Community School Corporation for 16 years, until she did not return to work following a critical performance review in May 2009. The next month, Plaintiff filed a claim for long-term disability benefits under her policy with Madison National Life Insurance Co., alleging that her adult stress reaction, fibromyalgia, and other medical conditions rendered her totally disabled and unable to work. Madison National denied the claim, concluding that Plaintiff was not disabled for the requisite minimum 90 days. Third-party administrator Disability Reinsurance Management Services, Inc. ("DRMS") affirmed the denial upon appeal.

In December 2010, Plaintiff sued Madison National and DRMS for breach of contract and breach of covenant of good faith and fair dealing. In August 2012, both Defendants moved for summary judgment. The Court denies Madison National's motion as to the breach of contract count because genuine issues of material fact remain to be resolved at trial. However, the Court grants DRMS's motion as to the same count, as Plaintiff conceded in her response brief that she had no contractual relationship with DRMS. Finally, the Court grants both Defendants' motions regarding breach of covenant of good faith and fair dealing because Plaintiff failed to

demonstrate that either acted with "dishonest purpose, moral obliquity, furtive design, or ill will," the state of mind required for bad faith.

**A. Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Rule 56(a) of the Federal Rules of Civil Procedure). Once the moving party has produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in that party's favor." *Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998). Nevertheless, the nonmovant may not rest upon mere allegations, but "must support the assertion by[ ] citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at

252. It is well-settled that summary judgment should be granted "only where it is perfectly clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts." *Cent. Nat'l Life Ins. Co. v. Fid. & Deposit Co. of Md.*, 626 F.2d 537, 539 (7th Cir. 1980) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

**B. Material Facts**

**(1)** *Plaintiff's Employment with South Central Community School Corporation*

Plaintiff worked as a guidance counselor for South Central Community School Corporation in Indiana for 16 years, from 1993 to 2009. (DE 31-3 at 3.) Her primary job duties were student scheduling, curriculum development, parent communications, testing programs, and individual and group counseling for careers and post-secondary education. (DE 31-2 at 45.)

During her employment, Plaintiff received multiple performance evaluations. (*Id.*; DE 27-14 at 23–34.) The former principal, John Arnett, gave Plaintiff a positive performance review in March 2007, after which Rick Gregg took over and became Plaintiff's supervisor. (*Id.*) Between 2007 and 2009, Plaintiff received increasingly negative reviews. (*Id.*)

In the May 15, 2009, evaluation, Principal Gregg rated Plaintiff as "unsatisfactory" in the areas of curriculum, student support team, and communication. (DE 27-14 at 30–31.) He noted her failure to improve since previous reviews with continued tardiness, negativity, blaming others, security problems in administering the ISTEP+ state standardized test, and other unprofessional behavior such as texting students. (*Id.* at 31–32.) Principal Gregg recommended that Plaintiff "improve visibility by taking a lap around the halls and stopping to talk with students and teachers." (*Id.* at 32.) He provided Plaintiff with additional ways to address these

problems in the "2009/2010 Improvement Plan." (*Id*. at 33–34.) Plaintiff felt "devastat[ed]" and "insult[ed]" by the principal's suggestions (DE 27-1 at 43), but she also understood that her job was in jeopardy if she did not satisfy the administration's expectations during the 2009–2010 school year (DE 27-14 at 9; DE 31-3 at 7).

Following this review, Plaintiff did not return to work. (DE 31-3 at 7.) Defendants claim Plaintiff decided to quit her job voluntarily because of the tension between her and Principal Gregg's administration. (DE 28 at 2, 4–5.) In contrast, Plaintiff claims she stopped working upon the recommendation of her physician, DE 31-4 at 3, because her "totally disabl[ing]" medical conditions prevented her from performing the physical requirements of the guidance counselor position (DE 1 at 3).

**(2)** *Plaintiff's Medical History*

Plaintiff had seen three doctors in the years leading up to her disability claim in June 2009: Dr. Ailes, her long-time family physician; Dr. Silberman, a neurologist; and Dr. Demko, a chiropractor. Later, in May 2010, she met with Dr. Neucks, a rheumatologist.

Plaintiff has been a patient of family physician Dr. Ailes since 1983. (DE 32-2 at 71.) Dr. Ailes testified that he first treated Plaintiff with medication for fibromyalgia in 2001. (DE 27-13 at 4.) On May 20, 2009—just five days after Plaintiff's poor performance evaluation by Principal Gregg—he diagnosed her with "[a]dult stress reaction, fibromyalgia, costochondritis of the left. Plan is off work for now." (*Id*. at 5.) On June 24, 2009, Dr. Ailes signed an Attending Physician's Statement to accompany Plaintiff's insurance claim, in which he listed a primary diagnosis of adult stress reaction and a secondary diagnosis of fibromyalgia as the reasons for

Plaintiff's inability to work. (*Id*. at 12.) At his May 16, 2012, deposition, Dr. Ailes opined that "[t]he adult stress reaction has gotten better. It's not an issue," even though it "was the primary thing affecting the fibromyalgia at the time." (*Id*.)

Starting in January 2009, neurologist Dr. Silberman treated Plaintiff for fibromyalgia (DE 32-2 at 72), but he did not diagnose her with it; instead, she "came with that diagnosis" (DE 29-12 at 2). He also testified that fibromyalgia is characterized by "muscular discomfort and pain, which is very chronic. By definition, it has to be at least six months of pain." (*Id*.) It also causes sleep disturbances and "the fibromyalgia fog," or clouding of a patient's thoughts. (*Id*.) He explained that the test for fibromyalgia is met when at least eleven "tender points" of intense pain are present in the patient's arms, legs, and trunk. (*Id*. at 2–3.) However, Dr. Silberman has never found more than nine or ten tender points in Plaintiff. (*Id*. at 3, 7.)

Chiropractor Dr. Demko worked with Plaintiff as of July 2002. (DE 32-2 at 72.) Through muscle testing and palpations, he diagnosed her with myofascial pain syndrome and chronic headaches. (DE 27-11 at 5.) He did not diagnose Plaintiff with fibromyalgia, instead relying on her statement that another doctor diagnosed it. (*Id*. at 3.) Dr. Demko also testified that he only treated the fibromyalgia indirectly as a complicating factor of Plaintiff's muscular condition. (*Id*.) He did not remember anything indicating that she was disabled before 2009. (*Id*. at 2.)

Rheumatologist Dr. Neucks became involved after Plaintiff's claim with Madison National was on appeal to DRMS. (DE 32-2 at 72–73; DE 32-3 at 21–23.) In May 2010, he diagnosed Plaintiff with fibromyalgia when she tested positive for twelve out of fourteen tender points. (DE 32-3 at 21–22.) Plaintiff also scored 85 out of 100 points on the fibromyalgia impact questionnaire. (*Id*. at 22.) Dr. Neucks stated that an average fibromyalgia patient scores about 50 points, and a significantly impaired patient scores around 70. (*Id*.) His additional diagnoses were

5

degenerative disc disease with spondylolisthesis, carpal tunnel syndrome, possible peripheral neuropathy, sleep apnea, degenerative arthritis, and depression. (*Id.*)

All four doctors, with Plaintiff's consent, released Plaintiff's medical records for review in the original claim and appeal processes. Additionally, these doctors submitted written answers to Defendants' questions and eventually were deposed for purposes of this lawsuit.

**(3)** *The Madison National Long-Term Disability Policy*

Plaintiff does not dispute Defendants' summary of the relevant terms and exclusions of the Madison National Long-Term Disability Policy in their memoranda supporting summary judgment. (DE 31 at 4; DE 32 at 4.)

The Policy under which Plaintiff seeks long-term disability benefits was issued to the South Central Community School Corporation effective January 1, 2009. (DE 27-1 at 6.) In the insuring clause, Madison National promised that "[i]f you become Disabled while insured under the Group Policy, we will pay LTD [Long-Term Disability] Benefits according to the terms of your Employer's coverage under the Group Policy, after we receive satisfactory Proof of Loss." (*Id.* at 12.)

> An insured becomes "Disabled" when:
>
> during the Elimination Period and your Own Occupation Period you are, as a result of Physical Disease, Injury, [or] Mental Disorder . . . unable to perform one or more of the Material Duties of your Own Occupation, and, due to such inability, your work earnings are less than 80% of your Indexed Predisability Earnings, and you are incapable of earning 80% or more of your Indexed Predisability Earnings.

(*Id.* at 17.) In order to qualify for benefits, the insured must be "continuously Disabled" throughout the Elimination Period, which is at least "90 consecutive calendar days." (*Id.* at 6, 8.)

6

The Policy considers the insured's "Own Occupation" to be "the occupation you routinely perform for the Employer at the time Disability begins. We will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (*Id.* at 9.) Similarly, "Material Duties" are "the duties generally required by employers in the national economy of those engaged in a particular occupation that cannot be reasonably modified or omitted." (*Id.* at 12.)

The Policy defines "Physical Disease" as "a physical disease entity or process that produces structural or functional changes in the body as diagnosed by a Physician," whereas an "Injury" is "a bodily injury that is the direct result of an accident, that is not related to any other cause, and which in and of itself results in your Disability within 90 days." (*Id*. at 9.) Finally, a "Mental Disorder" is "any mental, emotional, behavioral, psychological, personality, cognitive, mood, or stress-related abnormality, disorder, disturbance, dysfunction, or syndrome listed in the latest edition of American Psychiatric Association Diagnostic and Statistical Manual or the International Classification of Disease." (*Id.*)

The Policy contains a number of exclusions to coverage: "[y]ou are not covered for a Disability that has not been diagnosed by your attending Physician. Subjective complaints alone will not be considered conclusive evidence of a Disability. The attending Physician must be able to provide objective medical evidence to support his or her opinion as to why you are not able to perform the Material Duties of your occupation." (*Id.* at 23.)

**(4)** *Plaintiff's Claim for Benefits under the Madison National Long-Term Disability Policy*

On June 28, 2009, Plaintiff filed a claim for long-term disability benefits under the Policy. (DE 31-2 at 11–12.) She claimed that her disability was caused by "[d]epression and fibromyalgia—high level emotional stress and chronic pain," and her doctor ordered "no work at this time due to emotional stress." (*Id*. at 12.) Dr. Ailes also provided an Attending Physician's Statement with a primary diagnosis of adult stress reaction and a secondary diagnosis of fibromyalgia. (*Id*. at 15–16.) He recommended "no work at this time" and noted that Plaintiff "became unable to work" as of May 15, 2009, the date of her unpleasant performance review and the last day that she reported for work. (*Id*. at 15.)

**(5)** *Madison National's Consideration and Denial of Plaintiff's Claim*

Madison National Claim Specialist Scott Lullof reviewed Plaintiff's initial documents and requested additional records from Drs. Silberman and Demko. (DE 27-9 at 4.) Family physician Dr. Ailes also provided notes of Plaintiff's office visits beginning in March 2009. (DE 27-13 at 28–32.) He first diagnosed her "adult stress reaction" on May 20, 2009 (*id.* at 5) and noted improvements in Plaintiff's condition at the July 15, August 10, and October 26 visits (*id*. at 5, 13, 17). Neurologist Dr. Silberman submitted records as of January 2009, when he started treating Plaintiff for fibromyalgia. (DE 27-12 at 9–26.) He also noted on July 2, 2009, that "[s]he's now feeling much better . . . especially with less stress." (*Id*. at 6.) Finally, chiropractor Dr. Demko gave Madison National his office notes, which specify "subjective" complaints from the patient and "objective" supporting evidence from the doctor. (DE 27-11 at 4, 7–8.)

Lullof forwarded Plaintiff's records to Behavioral Medical Interventions ("BMI") for an independent review by psychiatrist Dr. Shipko and neurologist Dr. McIntire. (DE 27-9 at 5.) The former contacted Dr. Ailes by phone, and the latter contacted Dr. Silberman by phone. (DE 27-1 at 45–46.) Dr. Shipko sent a written summary of the conversation to Dr. Ailes for revisions. (*Id.*) Dr. Ailes's "minor changes" did not affect Dr. Shipko's conclusion that Plaintiff's psychiatric illness only prevented her from working between May 20 and July 15, 2009. (*Id.* at 47; DE 27-9 at 11.) However, Dr. Ailes adamantly asserts that his words were taken out of context and his revisions should have changed Dr. Shipko's outcome. (DE 27-13 at 13–14.) As for the claimed fibromyalgia, Dr. McIntire concluded that Plaintiff had no neurological disability. (DE 27-9 at 11.) Finally, BMI psychologist Kate Harri interviewed Plaintiff via phone and learned that, despite her asserted medical limitations, Plaintiff was still able to clean her house, cook, see friends, take her mother to doctors' appointments, read, and research genealogy at the library. (*Id.*; DE 27-1 at 42–45.)

Lullof reviewed Plaintiff's claim documents and medical records and BMI's reports before denying her claim on October 14, 2009. (DE 27-9 at 10–13.) He concluded that Plaintiff was not neurologically disabled, despite her asserted fibromyalgia. (*Id.* at 11.) He further concluded that Plaintiff was unable to work between May 15 and July 15, 2009, because of the extreme stress she experienced after her negative performance review, but by July 15, she "had returned back to [her] psychiatric baseline as a result of treatment." (*Id.*) Madison National believed Plaintiff's stress-inducing problems were localized at her previous school because of personal conflicts with that administration. (*Id.* at 11–12.) Because her two-month-long disabling condition did not last for at least 90 days as the policy required and because she could continue

9

performing her occupation elsewhere, Madison National denied Plaintiff's claim for long-term disability benefits. (*Id*. at 12.)

**(6)** *Plaintiff's Appeal and DRMS's Administration of the Appeal*

Madison National received Plaintiff's written appeal on November 16, 2009 (DE 32-3 at 39–49), which she withdrew before Madison National considered it (*id*. at 34). Plaintiff then submitted her renewed appeal on June 10, 2010, arguing that she had been totally disabled from May 16, 2009, to present. (DE 32-2 at 70–74.) She claimed fibromyalgia was her "primary reason for not returning to work after 7/15/2009" (DE 32-3 at 42) and that she "suffers from sleep apnea, degenerative disc disease of the lumbar spine, osteoarthritis, possible peripheral neuropathy, adult stress reaction, and depression," all which made it "impossible to consistently and adequately perform her job as a Guidance Counselor" (DE 32-2 at 70).

Madison National forwarded Plaintiff's entire appeal to a third-party administrator, DRMS. (DE 29-10 at 2.) Senior Appeals Analyst Jennifer Pardi-McCarthy reviewed Plaintiff's file (*id*. at 3, 6–7) and requested performance evaluations from her employer (*id*. at 8). She then had University Disability Consortium conduct an independent review of Plaintiff's entire claim history, including the previous record reviews. (*Id*.) Psychiatrist Dr. Lurie reviewed the alleged psychiatric disabilities (DE 29-3 at 14–29), and Physical Medicine and Rehabilitation Specialist Dr. Wagner reviewed the alleged physical disabilities (*id*. at 3–13, 28–29). Consistent with Madison National's decision, Dr. Lurie opined that Plaintiff's psychiatric functioning had returned to normal by July 15, 2009, and that her stress was likely attributable to the deteriorating relationship with her former supervisors. (*Id*. at 25–26.)

Dr. Wagner concluded that the medical evidence supported findings of fibromyalgia, knee osteoarthritis, and mild sleep apnea (*id*. at 10), but noted that Plaintiff's pain complaints were greater and pain treatments were less than would be expected for the asserted conditions (*id*. at 11–12). Because of this contradictory evidence, Dr. Wagner supported the claim denial (*id*. at 11–13), also recommending permanent restrictions on walking, standing, and other movements to accommodate Plaintiff's physical problems at work (*id*. at 10–11).

After Pardi-McCarthy reviewed the two doctors' reports and the entire claim file (DE 29-10 at 9), DRMS upheld the benefits denial on December 3, 2009 (*id*. at 10; DE 32-1 at 48–52). Like her complaint against Madison National, Plaintiff contends that she and Dr. Ailes provided numerous corrections and clarifications to the seemingly inconsistent record that DRMS failed to adequately consider. (DE 32 at 17–18.)

**C. Discussion**

**(1)** ***Count I (Breach of Contract) Against Defendant Madison National***

The Court agrees with Plaintiff that there are genuine issues of material fact that need to be resolved at trial before determining whether Madison National breached its long-term disability insurance contract with Plaintiff by denying her claim for benefits.

In order for Plaintiff to qualify for benefits under the Policy, she must be "disabled" for at least 90 days and unable to return to work in her occupation as a guidance counselor. The record is contradictory as to the severity and duration of Plaintiff's claimed disability, as well as its impact on her job. For example, Plaintiff asserts she cannot do the sedentary work of a guidance counselor, but she is able to do similar tasks such as reading and genealogy research in the

library, as well as more active work like cleaning her house, cooking, and driving her mother to doctors' appointments. It is also unclear whether the tender point test or fibromyalgia impact questionnaire is a reliable and objective way to diagnose fibromyalgia, and, if so, when Plaintiff demonstrated the requisite twelve out of fourteen tender points for a positive finding of fibromyalgia.

Because the parties disagree on the proper interpretation of the medical evidence from Drs. Ailes, Silberman, Demko, and Neucks—which is material to whether Plaintiff was disabled from working as a guidance counselor within the terms of the Policy and thus whether Madison National wrongfully denied her claim for insurance benefits—this matter is not appropriate for summary judgment. Rather, it is the jury's job to weigh the evidence and determine the credibility of the witnesses, eventually deciding which interpretation of, and inferences from, the conflicting medical evidence to accept. Therefore, the Court denies Madison National's motion for summary judgment on the breach of contract count.

**(2)** *Count II (Breach of Covenant of Good Faith and Fair Dealing) Against Defendant Madison National*

"Indiana law has long recognized a legal duty, implied in all insurance contracts, for the insurer to deal in good faith with its insured." *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). The unique nature of an insurance contract may create at times contractual, fiduciary, and adversarial relationships, for example, as the insured purchases the policy, makes privileged statements to the insurance company, and makes a claim for benefits. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). However, the duty of good faith and fair dealing only arises when the insurer and the insured have a "special" or fiduciary relationship that goes

beyond traditional, arms-length contract transactions. *Id*. Breach of this duty constitutes a tort because "[e]asily foreseeable is the harm that proximately results to an insured, who has a valid claim and is in need of insurance proceeds after a loss, if good faith is not exercised in determining whether to honor that claim. . . . [I]t is in society's interest that there be fair play between insurer and insured." *Id*. at 518–519 (citation omitted).

Another longstanding Indiana rule is that an insurance company may, in good faith, dispute the validity or amount of a claim. *Id*. at 520; *Freidline*, 774 N.E.2d at 40. A breach of the covenant of good faith and fair dealing occurs when "an insurer . . . denies liability knowing there is no rational, principled basis for doing so . . . . To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability." *Freidline*, 744 N.E.2d at 40 (citations omitted). The required state of mind for bad faith is one "reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (quotation omitted).

Here, the Court must determine whether, after reviewing the record in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, she cannot possibly demonstrate with a preponderance of the evidence that Madison National denied her claim in bad faith. *See Lummis v. State Farm Fire & Casualty Co.*, 2005 U.S. Dist. LEXIS 12346 (S.D. Ind. June 16, 2005) (the standard for proving that bad faith occurred is a preponderance of the evidence, even though that standard becomes clear and convincing evidence when the plaintiff is trying to prove that she deserves punitive damages for bad faith).

Plaintiff challenges Madison National's asserted good faith in processing her claim for benefits. Although there is medical evidence supporting the denial, Plaintiff has also presented

13

evidence that Madison National disregarded some of the records regarding the duration and effects of her medical conditions. For example, Dr. Ailes's office notes from as far back as 2001 indicate treatment for fibromyalgia. Plaintiff also challenges the appropriateness of Madison National's handling of her claim, for example, as Dr. Shipko refused to change his opinion that Plaintiff was not disabled after Dr. Ailes amended multiple statements in the summary of their conversation, upon which Dr. Shipko relied to make his determination.

However, these facts are not sufficient to establish bad faith on the part of Madison National, as Plaintiff has failed to demonstrate the requisite mental state behind the claim denial. The conflicting medical evidence may be relevant to her breach of contract claim, but, as for bad faith, Madison National had the right to evaluate the validity of Plaintiff's evidence and ultimately deny her benefits. Moreover, Dr. Shipko did take into consideration Dr. Ailes's conversation corrections before deciding to maintain his professional opinion that Plaintiff was not disabled. Just because Dr. Shipko interpreted Plaintiff's medical records differently than her family physician does not mean that Madison National acted with ill intentions. Because a reasonable juror could not infer that Madison National knew Plaintiff was "totally disabled" for longer than 90 days and chose to deny her claim anyway, Madison National's motion for summary judgment as to the breach of covenant of good faith and fair dealing count is granted.

**(3)** *Count I (Breach of Contract) Against Defendant DRMS*

In Plaintiff's response to DRMS's motion for summary judgment, she conceded that "DRMS cannot be held liable for Madison National's [alleged] breach of the disability policy since Indiana law provides that only a party to the contract can be held liable for its breach.

*Rodriguez v. Tech Credit Union Corp.*, 824 N.E.2d 442, 447 (Ind. App. 2004)." (DE 32 at 20). Because Plaintiff had no contractual relationship with DRMS, her breach of contract claim against it is without merit. DRMS's motion for summary judgment on the breach of contract count is granted.

**(4)** *Count II (Breach of Covenant of Good Faith and Fair Dealing) Against Defendant DRMS*

The duty of good faith and fair dealing may arise through a contract or a fiduciary relationship. Plaintiff conceded that she had no contractual relationship with DRMS, so such a duty could not have arisen by contract. But in an opinion written by Judge David F. Hamilton, the court in *Sieveking v. Reliastar Life Ins. Co.*, 2009 U.S. Dist. LEXIS 52763 (S.D. Ind. June 23, 2009), held that a third-party administrator of an insurance claim may have a fiduciary relationship with the insured, giving rise to a duty of good faith and fair dealing.

*Sieveking* is factually similar to the present case. That plaintiff had been a teacher for 24 years in Indiana before she stopped working due to multiple lung problems. *Id.* at *1. "Believing that Sieveking's impairments affected her only intermittently and that she retained the ability to work as a teacher at a different location, defendants denied her claim initially and in three internal appeals." *Id.* at *1–2. She sued the insurance company and the third-party administrator for breach of contract and breach of covenant of good faith and fair dealing, and both defendants moved for summary judgment as to the latter. *Id.* The court reviewed the *Erie Insurance Co.* factors for bad faith—"(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair

15

advantage to pressure an insured into a settlement of [her] claim," *Erie Insurance Co.*, 622 N.E.2d at 519—and denied the defendants' motions. *Id*. at *3, 5–6.

Judge Hamilton decided that the third-party administrator could be liable to the plaintiff for bad faith, even if it was not a party to the insurance contract. *Id*. at *5–6. He explained:

> The relationship of insurer to insured is at times fiduciary in nature. *Erie*, 622 N.E.2d at 518. As the administrator of Sieveking's claim and the employer of those persons who actually made the decisions to deny her claim, Madison National [the third-party administrator in this case] owed Sieveking a fiduciary duty to administer her claim in good faith.

*Id*. Any contrary result would be illogical, as an insured maintains the same trust and confidence in the company handling her claim and the company handling her appeal, assuming both fiduciaries will reach a fair and accurate outcome on her case at all stages of the process. For this reason, DRMS's attempt to distinguish *Sieveking* from the present case is unconvincing. It does not matter whether the third-party administrator handled the initial claim denial plus the appeals or the appeals only; the third-party administrator owes an insured the same duty of good faith and fair dealing throughout the entire insurance claim process.

According to *Sieveking*, DRMS did have a duty of good faith and fair dealing to Plaintiff, but, unlike in that case, a reasonable juror could not find that DRMS breached its duty to Plaintiff. Much like her claim of bad faith against Madison National, Plaintiff's claim against DRMS comes down to its alleged disregarding of parts of her medical records and of Dr. Ailes's corrections to, and clarifications of, the medical evidence during the appeal process. Here too, Plaintiff has not demonstrated the required mental state of dishonesty or ill intentions underlying DRMS's actions. Senior Appeals Analyst Pardi-McCarthy reached out to Plaintiff's employer for additional information and sought a second independent review of Plaintiff's entire claim file. Both the psychiatrist and the physical medicine and rehabilitation specialist agreed with Madison

16

National's original denial decision, supported by their professional opinions on Plaintiff's conflicting medical records. DRMS did not act in bad faith when it followed its third-party appeal process, providing ample opportunity for Plaintiff's claims to be reviewed and resulting in an unfavorable outcome for Plaintiff. Therefore, the Court grants DRMS's motion for summary judgment as to the breach of covenant of good faith and fair dealing count.

**D. Conclusion**

For these reasons, the Court:

- Denies in part Defendant Madison National's motion for summary judgment (DE 27) as to the count for breach of contract;

- Grants in part Defendant Madison National's motion for summary judgment (DE 27) as to the count for breach of covenant of good faith and fair dealing; and

- Grants Defendant DRMS's motion for summary judgment (DE 29).

SO ORDERED on December 12, 2012.

   S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE